ROBERT SARVIS,                           )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )      No. 14 C 09143
                                         )
BMO HARRIS BANK, MARGARET                )      Judge Edmond E. Chang
McELRATH, SALLY DEFOREST,                )
THOMAS RODMAN, and KENNETH               )
NYKIEL,                                  )
                                         )
            Defendants.                  )
                                         )

## MEMORANDUM OPINION AND ORDER

Money and family politics make for an ugly mix, according to the allegations in this diversity action.[1] Robert Sarvis, proceeding *pro se*, claims that Defendants BMO Harris Bank, Kenneth Nykiel, and Margaret McElrath violated their fiduciary duties and were negligent in their management of certain trusts set up to benefit Sarvis's late brother, Andrew. Sarvis is the alleged assignee of Andrew's property, including claims to bring lawsuits related to the trusts. Sarvis also claims that Defendants McElrath, Sally Deforest, and Thomas Rodman—who are cousins of the Sarvises—conspired to defraud him and his brother of their rights to expected

---

[1]Subject matter jurisdiction is invoked based on the diversity of the parties and the amount in controversy, under 28 U.S.C. § 1332(a). Plaintiff Robert Sarvis is a citizen of Massachusetts. R. 73, Sarvis Decl. On the Defendants' side, BMO Harris Bank is a national bank association that, for jurisdictional purposes, is an Illinois corporation because its article name that State as the main office (and its principal place of business is there, to the extent that remains relevant after *Wachovia Bank v. Schmidt*, 546 U.S. 303, 318 (2006)), R. 75, BMO Jurisdictional Stmt.; McElrath and Deforest are citizens of Texas and Rodman of Wisconsin, R. 76, Rodman Siblings Jurisdictional Stmt.; and, Nykiel is a citizen of South Carolina, R. 77, Nykiel Jurisdictional Stmt.

inheritances. All Defendants have moved to dismiss the complaint on the basis that Sarvis lacks standing and, alternatively, fails to state a claim for relief. BMO also moves for sanctions against Sarvis for bringing meritless claims for the sole sake of harassing the bank. R. 37, 45, 50. For the reasons given below, the motions to dismiss are granted and the motion for sanctions is denied without prejudice.

## I. Background

## A. Factual Allegations

The amended complaint's factual allegations, which must be accepted as true for now, are sprawling, covering at least six States, four generations of Sarvis's family, three trusts, two wills, some lake property, and millions of dollars. To make proper sense of the facts that follow, it is first necessary to introduce the cast of players (and who had the money and how much of it) in this family drama.

Helen and Robert Hammond, the progenitors of the line, had three children: James Hammond, Mary Rodman, and Jean Sarvis. *See* R. 22, Exh. A, Hammond Ancestral Chart. Mary was the mother of Defendants Margaret McElrath (who in turn had one son, Ryan), Sally Deforest, and Thomas Rodman; Jean's children were Robert Sarvis (the Plaintiff) and his siblings, Andrew and Helen Sarvis. R. 22, Am. Compl. ¶¶ 50, 93, 114; *see* Hammond Ancestral Chart. For clarity's sake, the Court refers to the Plaintiff as Sarvis and his siblings by their given names.

Helen and Robert Hammond left an estate of over $5 million, which was held in a trust in Helen's name. Am. Compl. ¶ 13. Among the trust's assets were two parcels of family-held real estate located in Michigan, called the Glen Lake

properties. *Id.* ¶ 17. Upon Helen's death, her living children, James and Mary, were named trustees. *Id.* ¶ 14. Defendant BMO Harris Bank was the corporate trustee. *Id.* ¶ 15. Per the terms of the trust, upon its termination in August 2014, a total of $811,927 was disbursed in equal parts to five of Helen's grandchildren—each of Mary and Jean's offspring *except* Robert Sarvis. *Id.* ¶ 16. Helen's trust specifically excluded Sarvis from any rights to benefit from its provisions. R. 22, Exh. C, Helen Hammond Trust Agreement at 6.

In addition, James Hammond established a life insurance trust in his name for the benefit of his mother Helen, his sister Mary, and his nephew Andrew. *Id.* ¶ 19. It is alleged that this trust had residual assets of around $230,600 as late as at Mary's death in 2013. *Id.* ¶ 24. BMO and Kenneth Nykiel, another Defendant, are trustees of the James Hammond trust. *Id.* ¶¶ 21, 22.

Finally, Andrew had a trust in his name as well. *Id.* ¶ 25. Because he was incapable of managing his own affairs, for reasons discussed below, the trustee was designated to make all of his financial decisions. *Id.* ¶ 26. Margaret McElrath, the Sarvises's cousin, became that trustee in 2008. *Id.* ¶ 27. Andrew's trust allegedly held close to $60,000 in 2002 but was eventually depleted to near zero by 2009. *Id.* ¶ 28.

## 1. Andrew is Neglected and Manipulated

From young adulthood on, Andrew suffered from chronic and severe mental illness, including bi-polar disorder, schizophrenia, general anxiety, and hallucinations during which he heard voices, and he spent most of his life in and out

of mental-health institutions. Am. Compl. ¶ 51. According to Sarvis, Andrew was never able to keep a job and he depended on payments from the family trusts to survive. *Id.* ¶¶ 52, 55, 56. Sarvis alleges that, in total, Andrew had an inheritance of $1.2 million and that Andrew's aunt Mary Rodman and cousin Margaret McElrath, along with another trustee named Irwin Askow, were responsible for authorizing the payments to Andrew. *Id.* ¶¶ 20, 56.

In the early 1980s, James Hammond, against the recommendation of Andrew's doctors, moved his nephew Andrew from a Veterans Affairs hospital in Ohio to Chicago, where James lived. *Id.* ¶ 57. James, as well as Sarvis, provided Andrew with living and medical expenses, but Andrew allegedly was living "hand to mouth with minimal financial resources." *Id.* ¶ 58. James died in 1986 and Sarvis, who lives in New England, became concerned for Andrew's welfare and sought to become his guardian, but was "prevented" from moving to Chicago to do so by Mary Rodman, McElrath, and Askow (how they prevented Sarvis from moving is not explained). *Id.* ¶ 59. Sarvis asserts that the three opposed the move in order to keep Sarvis in the dark about the trusts, because Sarvis was likely to make demands for Andrew's increased support that would diminish the principal if the true state of the trusts' finances were discovered. *Id.* ¶ 60.

There was apparently much to hide. Askow allegedly used his influence over Andrew to become his lawyer, have Andrew sign over his power of attorney to Mary Rodman, and then himself become named trustee of Andrew's trust, with McElrath as successor trustee—all without Andrew understanding what was transpiring. *Id.*

¶¶ 83-88. After Askow died in 2008, Defendant Nykiel, who Sarvis alleges had been working hand in glove with Askow, became the sole trustee of the James Hammond trust, but "failed to perform any of his duties." *Id*. ¶¶ 79, 91, 92. At that point, Sarvis alleges, McElrath transferred the remaining $25,773 in assets in Andrew's trust to BMO. *Id*. ¶ 30. (That is the extent of the allegations concerning Nykiel and BMO.) By November 2009, virtually all of the money was gone, only $60 having been given to Andrew. *Id*. ¶ 31.

In the meantime, Andrew's health deteriorated to the point of being confined to a wheelchair, and he was permanently hospitalized in a rehabilitation center in 2003. *Id*. ¶¶ 61, 62. Sarvis visited Andrew on several occasions at the center and was dissatisfied with his brother's accommodations, but Askow assured Sarvis that they were the best possible in light of Andrew's financial circumstances. *Id*. ¶ 63. When Sarvis visited again in 2007, Sarvis found that Andrew had been moved from a private room to one he shared with three others, and that Andrew had limited clothes and no books, writing supplies, or access to television and radio. *Id*. ¶ 64. Sarvis bought Andrew new clothes and supplies, and continued to send those things, as well as food, after he left. *Id*. But on future visits, Sarvis found Andrew in a similarly deprived state. *Id*. ¶¶ 66, 68. When Sarvis asked the staff at the center about Andrew's finances, they professed that they knew nothing about any trusts and that, if one had existed, it must have been long depleted. *Id*. In November 2013, Sarvis communicated with a distant family member whom he mistakenly believed to be Andrew's attorney; this lawyer informed Sarvis that he did not represent

Andrew and inaccurately told Sarvis that the James Hammond trust had run out (the source of this lawyer's misinformation is unclear). *Id.* ¶ 68. Sarvis alleges that, in reality, that trust had assets in excess of $500,000 at that time. *Id.* ¶ 69.

On top of this subterfuge about the trusts, Sarvis alleges that McElrath, as well as another lawyer working with Askow, kept the existence of Andrew's will a secret, lying to Sarvis and his sister Helen, who lived in Florida, by representing that no will existed for fear that they would challenge it. *Id.* ¶¶ 20, 71-73, 107. Sarvis contends that McElrath in fact "engineered its creation and terms," and Andrew demonstrated no knowledge of any will to Sarvis. *Id.* ¶¶ 71, 74. McElrath, who lived in Milwaukee, Wisconsin, used her proximity and Andrew's incapacitated mental state "to gain control" over him, developing "a special confidential relationship with him." *Id.* ¶ 115. With Andrew's confidence won over, McElrath allegedly had Askow draft Andrew's purported will, leaving everything to McElrath's son Ryan and any other future children McElrath might have. *Id.* ¶¶ 114, 120. Andrew had met Ryan, his nephew, on only one occasion, when McElrath brought him to visit his hospitalized uncle. *Id.* ¶ 116. Evidently, Andrew signed the will, with McElrath as witness. *See* R. 22, Exh. L, Last Will of Andrew Sarvis.

## 2. Sarvis Challenges Andrew's Will

Andrew died on June 1, 2014. Am. Compl. ¶ 32. The amended complaint does not recount what happened next with clarity, but state-court documents submitted by the Defendants (whose authenticity is unchallenged by Sarvis) shed adequate

light. Andrew's will was admitted to probate by a Cook County state court. *See* R. 50, Exh. 1, Order Admitting Will to Probate, entered June 12, 2014. Sarvis petitioned to set aside the will, alleging, among other things, that Ryan, Mary, Margaret, and Askow "gained special confidence of" Andrew through "wrongful use of influence, [ ] force, intimidation, duress, or deception." R. 50, Exh. 2, Pet'n to Set Aside Will, filed July 15, 2014, at 7-8. Despite owing him a fiduciary duty to act in good faith, Sarvis's petition alleged, McElrath and company "made numerous false representations" to Andrew in order to "improperly control[ ], dominat[e], and mislead[ ]" him to execute the will in Ryan's favor, instead of (at least in part) Sarvis's. *Id*. at 8.

A few months later, Sarvis settled his challenge of the will in an agreement dated October 31, 2014. *See* R. 50, Exh. 3, Settlement Agreement and General Release of Claims. The settlement provided that Sarvis, his sister Helen, and Ryan would each receive $10,000 from Andrew's estate (apparently that was all of the liquid assets left) and that Sarvis and Helen would each be assigned "in equal shares all interest in any personal effects and other tangible personal property of the Decedent to the extent any such property currently exists." *Id*. at 2-3. (Sarvis attached to the amended complaint a copy of the document memorializing the assignment but, for reasons that will become evident, left out the settlement agreement itself. *See* R. 22, Exh. M, Assignment.) Ryan agreed to release any rights to Andrew's tangible property and Sarvis agreed not to "attempt to file any citations on behalf of the Estate, [n]or oppose the closing of the Estate." Settlement

Agreement, at 3. The agreement stipulated that its validity and enforceability would be construed under Illinois law. *Id.* at 4. Shortly after the settlement was signed, Helen assigned her rights to the tangible property received under the agreement to Sarvis. *See* R. 22, Exh. F, Assignment, dated Nov. 8, 2014.

### 3. Mary Rodman Assigns Lake Property only to Her Children

But Andrew was not the only alleged victim of family intrigue. As Sarvis tells it, Mary Rodman, who Sarvis suggested played a role in manipulating Andrew, got a taste of her own medicine. In 2011, following the death of her husband, an elderly Mary moved from North Carolina to Texas, where her daughters McElrath and Sally Deforest lived, and Mary was placed in assisted living quarters. Am. Compl. ¶ 47. By that point, Mary was suffering from dementia and fell under the influence of her daughters. *Id.* ¶ 100.

That is when McElrath allegedly launched another scheme designed to strike at her Sarvis cousins, enlisting her sister Sally and brother Thomas Rodman this time to conspire "to disinherit Helen and Andrew from the Glen Lake Properties." *Id.* ¶ 95. The entire family had used the Glen Lake real estate, subdivided into two parcels, as a vacation retreat since the 1930s. *Id.* ¶ 96. Remember that the land had been held by the Helen Hammond trust. According to Sarvis, that trust had left Mary, as the last surviving child of Robert and Helen Hammond, with a power of appointment to bequeath the land to the Hammond grandchildren (the Plaintiff's generation) as he or she wished. *Id.* ¶ 97. Before his cousins set to work on her, Sarvis continues, Mary had drafted an "initial codicil" to her will exercising this

power, leaving one parcel to McElrath and her siblings and the other to Helen and Andrew Sarvis (note that Plaintiff is not mentioned). *Id.* ¶ 97. The amended complaint alleges that McElrath, Deforest, and Thomas Rodman, knowing that Mary wished to keep the property in family hands, made the false claim to Mary that Helen and Andrew intended to sell their parcel. *Id.* ¶ 98.

Sarvis alleges that Mary never voided the initial codicil, which McElrath later destroyed. *Id.* ¶ 103. (No copy apparently survives, or at least Sarvis provides none. How he knows of its contents is not explained.) Mary, under pressure from her children, executed a new will, including a "First Codicil" that left both Glen Lake parcels only to McElrath and her siblings (this version Sarvis does furnish). *Id.* ¶ 109-10; *see* R. 22, Exh. L, First Codicil. The existence of the purported "initial codicil" was hushed up. *Id.* ¶ 108. With everything thus prepared, the last part of McElrath's plan fell into place when Mary, aged 93, died in 2013. *Id.* ¶ 49.

### B. Procedural History

Sarvis commenced this lawsuit on November 13, 2014, less than two weeks after settling his state-court challenge to Andrew's will. *See* R. 1, Compl. The amended complaint raises six counts: Count 1 alleges breach of "trustee duties" by Nykiel and BMO in their roles as trustees of the James Hammond trust, Am. Compl. ¶¶ 121-35; Count 2, negligence against Nykiel and BMO in their management of the same trust, *id.* ¶¶ 136-42; Count 3, gross negligence against Nykiel and BMO for the same, *id.* ¶¶ 143-46; Count 4, breach of "trustee duties" against McElrath in her role as trustee of the Andrew Sarvis trust, *id.* ¶¶ 147-53;

Count 5, conspiracy by McElrath, Sally Deforest, and Thomas Rodman to defraud Andrew and Sarvis of their rights to expectancy of inheritance, *id.* ¶¶ 154-67; and Count 6, conspiracy by McElrath and Thomas Rodman to defraud Sarvis of his right to expectancy of inheritance, *id.* ¶¶ 168-90. Sarvis seeks actual damages and over $5 million in punitive damages. *See* Am. Compl. at Prayer for Relief.

Three separate motions to dismiss are now pending. BMO [R. 37] and Nykiel [R. 45] move separately to dismiss Counts 1 to 3, and siblings McElrath, Deforest, and Thomas Rodman [R. 50] move to dismiss Counts 4 to 6. Each of the Defendants premise their motions on Sarvis's lack of standing under Federal Rule of Civil Procedure 12(b)(1) and his failure to state a claim under Rule 12(b)(6). In addition, BMO moves for sanctions under Rule 11 against Sarvis, in the form of reasonable attorney's fees and costs associated with its dismissal motion, arguing that Sarvis brought his claims despite being warned that they lack any basis in law. *See* R. 37, BMO Mot. Dismiss.

## II. Legal Standards for Motions to Dismiss

By invoking Rule 12(b)(1), a defendant seeks to dismiss a claim or suit on the ground that the court lacks jurisdiction. *See Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir. 2009). When evaluating such a motion, the court must accept all well-pled allegations as true and draw reasonable inferences in the plaintiff's favor. *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). The court may "look beyond the jurisdictional allegations of the complaint and view whatever

evidence has been submitted on the issue." *Id.* (quoting *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993) (per curiam)).

A motion to dismiss under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Discussion

#### A. Motions to Dismiss

The Defendants are correct that Sarvis's various claims either cannot be brought by him because he lacks standing, or fail to state an adequate claim. The Court addresses these deficiencies, which end-up resolving each of the six counts, in turn.

##### 1. Sarvis Lacks Standing to Sue Trustees (Counts 1 to 4)

The first four counts share something in common: in each, Andrew Sarvis was the allegedly injured person. Specifically, these claims relate to BMO's, Nykiel's, and McElrath's performance as trustees of two trusts upon which Andrew Sarvis relied, allegedly in vain, for critical financial support. The problem is that

the person bringing the claim is not Andrew or the administrator of his estate; it is his brother Robert Sarvis. But Sarvis lacks the standing to do so.

First, Counts 1 and 4's allegations of a breach of "trustee duties," by which Sarvis evidently means to assert that the particular Defendants violated common-law fiduciary obligations.[2] A fiduciary is one who by virtue of a specific, legally-defined role "owes a duty of loyalty to the person or entity for whom [she] is acting." *Hawkins v. Voss*, — N.E.3d —,—, 2015 IL App (5th) 140001, ¶ 31 (Ill. App. Ct. 2015) (identifying guardians, executors, administrators, agents, and trustees as examples) (citing *Janowiak v. Tiesi*, 932 N.E.2d 569, 581 (Ill. App. Ct. 2010)). As one example, "a trustee owes a fiduciary duty to a trust's beneficiaries and is obligated to carry out the trust according to its terms and to act with the highest degrees of fidelity and utmost good faith." *In re Estate of Muppavarapu*, 836 N.E.2d 74, 77 (Ill. App. Ct. 2005) (trustee may not deal "with the trust's property for her individual benefit") (citation omitted). Because the duty is premised on the existence of this particular legal relationship, it follows that allegations against self-serving trustees, even if true, cannot be brought by just anyone: "it is the trust *beneficiary* who has the right to bring an action for damages based on a breach of fiduciary duty by the trustee." *Fuller Family Holdings, LLC v. N. Trust Co.*, 863 N.E.2d 743, 754 (Ill. App. Ct. 2007) (emphasis added) (citing Restatement (Second) of Trusts § 199). Sarvis does not allege that he is in any way a beneficiary of the trusts in question.

---

[2]The parties assume that Illinois law applies; according to copies of the trust agreements attached to the amended complaint, each of the trusts involved in this case provided that Illinois law should govern disputes involving their validity and operation. *See* Helen Hammond Trust Agreement at 16; R. 22, Exh. D, James Hammond Trust Agreement at 12; R. 22, Exh. E, Andrew Hammond Trust Agreement at 2.

Though he may have been concerned enough as an immediate relative to file suit (after Andrew died following years of neglect, anyway), his shared blood does not somehow imbue him with the right to sue for breach of fiduciary duty in his brother's stead, as if a beneficiary himself.[3]

Counts 2 and 3, which allege negligence and gross negligence, fare no better for the same reason. It is a basic principle that in a cause of action for negligence, "a plaintiff must plead that the defendant owed a duty of care *to the plaintiff*." *Cowper v. Nyberg*, 28 N.E.3d 768, 772 (Ill. 2015) (emphasis added). Any applicable standard of care owed by the trustees, even if such a duty existed as a matter of tort law,[4] would have been directed towards Andrew as beneficiary. The harm that Sarvis describes—deprivation of entitled-to funds based on the self-serving actions of the trustees—was to his late brother, not to him. As with the fiduciary-duty claims, Sarvis accordingly cannot demonstrate the "personal injury fairly traceable to the defendant's unlawful conduct" necessary to establish standing. *Allen v. Wright*, 468

---

[3]The administrator of Andrew's estate, by contrast, could have brought such a claim while the estate was still in existence. *See McGill v. Lazzaro*, 416 N.E.2d 29, 31 (Ill. App. Ct. 1980) ("The well established rule in this state is that the executor or administrator of a decedent's estate has standing to file suit on behalf of the decedent, but the legatees, heirs, and devisees have no such standing.") (citing *Claussen v. Claussen*, 116 N.E. 693, 696 (Ill. 1917)).

[4]It does not. Sarvis cannot recast the same conduct at issue in the claims for breach of fiduciary duty in the guise of a tort claim, which is all that Counts 2 and 3 do. Those types of dressed-up torts are not cognizable and "courts have dismissed actions sounding in tort … when the action is based on a trustee's failure to meet its obligations under a trust agreement." *Harry & Jeanette Weinberg Found. Inc. v. ANB Inv. Mgmt. & Trust Co.*, 1997 WL 652342, at *4 (N.D. Ill. Oct. 10, 1997) (citing cases). Moreover, gross negligence, as alleged by Count 3, is not recognized under Illinois law as an independent ground for recovery. *Merit Ins. Co. v. Colao*, 603 F.2d 654, 659 (7th Cir. 1979) (citing *C.R.I. & P. Ry. v. Hamler*, 74 N.E. 705 (Ill. 1903)).

U.S. 737, 751 (1984); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Sarvis counters that, by virtue of the assignment of interests to him by the executor of Andrew's estate, he, "as assignee, *bec[a]me the beneficiary*" and "is free to bring any action" that survived Andrew's death under Illinois law. R. 57, Pl.'s Resp. Br. at 6-7 (citing 755 ILCS 5/27-6) (listing actions for injury to real or personal property, for misfeasance, and for deceit among those that survive death of would-be plaintiff). Not only is he wrong, he has presented the relevant facts and law in an incomplete way.

The assignment Sarvis cites was prompted by a settlement agreement with Andrew's estate, a copy of which Sarvis failed to include with his pleadings, even though the agreement is the purported basis for the assignment. The settlement stated that, in addition to $10,000 each, "all interest in any personal effects and other tangible personal property" would be assigned to him and his sister (who later signed over her equal interest to him).[5] Settlement Agreement at 2-3. This wording does not reasonably support Sarvis's allegation that he therefore became the "owner of all Andrew's rights of actions." Am. Compl. ¶ 35. Mashing together multiple entries of Black's Law Dictionary, Sarvis argues as follows. "Personal effects" is defined in part as "personal property owned by a decedent." Black's Law Dictionary

---

[5]Sarvis opposes Defendants' reliance on the "personal effects" language as a violation of the parol evidence rule. Pl.'s Resp. Br. at 8-9. That doctrine does not apply here. "The parol evidence rule excludes evidence of prior or contemporaneous oral and written agreements which would vary a written contract." *Deckard v. Gen. Motors Corp.*, 307 F.3d 556, 563 (7th Cir. 2002) (citation and internal quotation marks omitted). Defendants make no attempt to introduce extrinsic evidence to interpret the settlement agreement.

(10th ed. 2014). Sarvis states that Black's Dictionary in turn "defines 'personal property' as [a] 'bundle of rights' including 'choses in action,'" suggesting that "personal effects" must then include a right of action, or just another stick in that bundle. Pl.'s Resp. Br. at 12. But Black's does not actually define "personal property" in this way. It does invoke the term "bundle of rights," but in the context of its use as a metaphor to describe the concept of "property" at its broadest—not to describe personal property specifically, and certainly not in relation to the narrower-still category of personal effects. Black's Law Dictionary (10th ed. 2014).

Contrary to Sarvis's view, "[t]he term 'personal effects,' without qualifying words, ordinarily embraces tangible property as is worn or carried about the person, or tangible property having some intimate relation to the person." *In re Estate of Goodkind*, 827 N.E.2d 6, 14 (Ill. App. Ct. 2005) (quoting 80 Am. Jur. 2d Wills § 1098, at 294 (2002)). The term *can* have a broader meaning, but only where such an alternate intent is evident or suggested by a "latent ambiguity in a contract." *Id.* (citing *Landstrom v. Krettler*, 435 N.E.2d 149, 151-52 (Ill. App. Ct. 1982) ("personal effects" can encompass silverware); *Turner v. Fletcher's Estate*, 483 S.W.2d 176, 178 (Ark. 1972) (term, given proper context, can include financial instruments); *Ellege v. Henderson*, 218 S.W. 831, 832 (Ark. 1920) (same for furniture)). Here, the settlement agreement, describing "personal effects and *other tangible personal property*," Settlement Agreement at 2-3 (emphasis added), was clear on its face that the ordinary understanding of the term—clothing and other concrete objects connected to the testator's physical person—applied. And, even if there had been a

hint of a broader intended meaning, there is no authority for the proposition that "personal effects" can go so far (beyond silverware, furniture, bank accounts and other examples of physical "personal property" that courts have allowed) as to include rights of causes of action and other abstract, non-tangible kinds of property. *See, e.g., Goodkind*, 827 N.E.2d at 16 (refusing to "expand[ ] the meaning of 'personal effects' to encompass real estate").

Sarvis cites to three Illinois cases that he claims support his interpretation, but they do not. Sarvis's quotation from one, "[p]ersonal effects' embrace *every kind of property, including things in action*," Pl.'s Resp. Br. at 13, does not actually appear in the cited opinion. *See Union Nat. Bank v. Byram*, 22 N.E. 842 (Ill. 1889). The quote, at least in substantial form, appears instead to come from another 19th century Illinois Supreme Court opinion which deals with the meaning of the word "effects" within a 1783 treaty between the United States and Sweden. *Adams v. Akerlund*, 48 N.E. 454, 456 (Ill. 1897). Next, *Linn v. Davis*, 223 Ill. App. 503 (1922), contrary to Sarvis's characterization, does not interpret "personal effects" to include the right to sue. Pl.'s Resp. Br. at 13. *Linn* makes no mention of any non-tangible rights, only personal property. 223 Ill. App. at 508. Third, *Andrews v. Applegate* similarly deals only with whether "effects" could encompass real property. 79 N.E. 176, 177 (Ill. 1906). Accordingly, Sarvis's citations to and descriptions of authority are inaccurate and of no moment. As Sarvis has no basis to assert a cause of action assigned to him from his brother, Counts 1 to 4 are dismissed for lack of standing.

## 2. Sarvis Lacks Standing to Challenge Inheritance of Property (Count 5)

Count 5 of the amended complaint alleges a conspiracy by McElrath and her siblings to defraud Sarvis and his brother of their rights to an expected inheritance, in Mary Rodman's will, of one of the Glen Lake parcels. Similar to Counts 1 to 4, Sarvis has no standing to bring this tort claim because he has not alleged an injury to his—as opposed to Andrew's—interests. To invoke a federal court's jurisdiction, a "plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted) (citing cases). By the terms of his own pleadings, Sarvis does not allege such an injury to him as a result of the alleged manipulation of Mary Rodman. Remember that his allegations explicitly state that, before the tortious interference occurred, it was his brother Andrew and sister Helen—and only they—who were Mary's intended recipients of one of the Glen Lake parcels. Sarvis never pleads that *he* had an actual expectation to inherit any of the property himself. Nor could he, for his grandmother Helen Hammond evidently disinherited him long before the codicils came into play: "I have made no provision in this trust for Robert Sarvis as I believe he is adequately provided for in other ways." Helen Hammond Trust Agreement at 6. Given the absence of any legal right to his claimed inheritance, notwithstanding whatever grudge for an unjust deprivation he may nurse, he has not been legally injured.[6] Count 5 is dismissed.

---

[6] Sarvis's inability to plead any possibility that he himself was injured means that the Court need not delve into thornier issues implicated by his claim. First, there is the

### 3. Settlement Bars Sarvis's Claim Based on Brother's Will (Count 6)

Finally, Count 6, alleging a conspiracy by McElrath and Thomas Rodman to defraud Sarvis out of his inheritance of his brother Andrew's estate, must fail because Sarvis already brought, then voluntarily dismissed with prejudice, the same claim in state court. In his petition challenging Andrew's will in probate court, Sarvis raised the very same factual allegations and legal claims against McElrath and Thomas Rodman as he does here: that they exploited Andrew's mental illness to gain his confidence and then improperly dominated him to make McElrath's son, and not Sarvis and his sister, sole heir. Pet'n to Set Aside Will at Count 4. Sarvis, in consideration of $10,000 and an interest in Andrew's personal effects, then signed a general release of all claims against the estate, Settlement Agreement at 2-4, and the state court filed an order noting the stipulation and dismissing with prejudice, R. 50, Exh. 4, Cook County Circuit Court Order dismissing Pet'n dated Oct. 31, 2014. "Because [Sarvis] voluntarily dismissed [his] state court claims pursuant to the settlement agreement, the state court dismissal order (adopting that agreement) is a final judgment that is entitled to *res judicata* effect." *4901 Corp. v.*

---

complicated question of whether a claim for tortious interference with inheritance falls into the so-called probate exception to federal diversity jurisdiction. *See Storm v. Storm*, 328 F.3d 941, 947 (7th Cir. 2003) (finding no subject-matter jurisdiction over a tort claim for interference with inheritance right because it is ancillary to probate matters); *but cf. Marshall v. Marshall*, 547 U.S. 293, 311 (2006) (understanding the probate-exception to have very limited application to where a federal court might potentially "disturb[ ] or affect [ ] the possession of property *in custody* of a state court") (emphasis added) (citation omitted). Second, assuming that it does not, there would have been the problem of which state's substantive law governs the interference with inheritance cause of action (provided it is recognized at all) in this, a situation involving an aggrieved heir in Illinois, a disputed inheritance located in Michigan, and a will executed by a wrongly manipulated testator in Texas. *See, e.g., Abad v. Bayer Corp.*, 563 F.3d 663, 669 (7th Cir. 2009) (assumption in most United States jurisdictions that law of the place that tort occurred governs).

*Town of Cicero*, 220 F.3d 522, 530 (7th Cir. 2000) (noting that a court-adopted settlement agreement is conclusive for "any issue which might have been raised in the proceeding") (citing *Jackson v. Schencker & Schencker*, 494 N.E.2d 669, 670 (Ill. App. Ct. 1986)); *see also Torres v. Rebarchak*, 814 F.2d 1219, 1223 (7th Cir. 1987). After the dismissal order, Sarvis turned around and filed the same claim in his petition in this Court, not two weeks later. Count 6 is therefore barred, and must be dismissed.

## B. BMO's Motion for Sanctions

With all of Sarvis's claims dismissed, it remains to consider whether Sarvis should be sanctioned for his conduct in this case, as BMO argues. BMO asks for reasonable attorney's fees and other expenses it has incurred filing its motion to dismiss Sarvis's action, stating that it served two separate Rule 11 letters to Sarvis, in December 2014 and on January 20, 2015 requesting that Sarvis withdraw his claims "in light of his clear lack of standing." R. 41, BMO's Br. at 15; *see* Fed. R. Civ. P. 11(c) (requiring party seeking sanctions to give notice of its intent and provide at least 21 days for other party to respond and cure).[7] It is a very close call, but the Court determines, on the present record, that an award of sanctions is not justified.

Rule 11 sanctions may be imposed on a party for "making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or

---

[7]The other Defendants, Nykiel as well as McElrath and her siblings, also appear to invoke Rule 11 to seek their own award of sanctions from Sarvis. *See* R. 39, Nykiel's Br. at 13; Defs.'s Joint Br. at iii. These requests, raised summarily for the first time in briefs without any separate support, cannot be entertained. It is only BMO that properly moved for sanctions and provided Sarvis with the proper notice-and-cure period that Rule 11 requires. Fed. R. Civ. P. 11(c)(2).

asserted for an improper purpose." *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998) (defining "frivolous argument or claim" as "one that is baseless and made without a reasonable and competent inquiry.") (citation and internal quotation marks omitted). A court should "take account of the special circumstances that often arise in *pro se* situations," but ultimately, "[s]anctions can be imposed for any suit that is frivolous," even one brought by the unrepresented. *Vukadinovich v. McCarthy*, 901 F.2d 1439, 1445 (7th Cir. 1990) (citation and internal quotation marks omitted).

BMO contends that the "frivolity of his claims" is underscored by the fact that Sarvis was only assigned his brother's "personal effects" (the basis of his belief that he could sue on Andrew's behalf) after he filed the present lawsuit. R. 68, Defs.' Joint Reply Br. at 19 and n.8 (noting that complaint was filed in November 2014 but the assignment was not executed until December 2014). But this characterization overlooks the fact that the settlement agreement between Sarvis and Andrew's estate providing for the assignment was signed at the end of October 2014, and Sarvis evidently relied on its terms to believe he had a cause of action.

To be sure, that belief did border on the unreasonable. It takes some imagination to read the term "personal effects," which has an everyday meaning and is hardly an example of lawyerly mumbo-jumbo, to encompass the types of legal rights of action that Sarvis asserted. And Sarvis certainly took great liberties in contorting Black's Law Dictionary and timeworn Illinois case law to defend his claims once he faced their possible dismissal. But even lawyers will make, from

time to time, jumbled readings of legal dictionaries and obscure legal precedent to try and win motions (though not often approaching this extent of stretching plausibility). The Court will therefore give Sarvis the benefit of the doubt, based solely on his *pro se* status as a non-lawyer (it is presumed that he is not a lawyer, although the allegations do not state his profession), to find that his claim was not so frivolous as to be sanction-worthy. "While the Rule 11 sanction serves an important purpose, it is a tool that must be used with utmost care and caution." *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Servs., Inc.*, 9 F.3d 1263, 1269 (7th Cir. 1993) (quoting *FDIC v. Tekfen Constr. & Installation Co., Inc.*, 847 F.2d 440, 444 (7th Cir. 1988)).

That said, the Court notes that BMO did not present much factual support to justify its motion, including facts that might show that Sarvis did intend solely to harass it (aside from merely disagreeing with Sarvis's belief in his standing) or that Sarvis, for whatever reason, should have known that his arguments were frivolous despite being *pro se*. BMO's sanction motion is therefore dismissed without prejudice to renewal if such facts exist. *See, e.g.*, *United States ex rel. Ivanich v. Bhatt*, 2015 WL 249413, at *3 (N.D. Ill. Jan. 20, 2015) (motion for sanctions denied without prejudice, leaving possibility of refiling upon more evidence).

## IV. Conclusion

For the reasons given above, Defendants' motions to dismiss the amended complaint are granted. BMO's motion for sanctions is denied without prejudice.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: May 19, 2015